# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00598-CV

**Carlos Smith and Bobbie Hinojosa Smith, Appellants**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT
NO. 12,634, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Carlos and Bobbie Hinojosa Smith appeal the trial court=s judgment terminating their parental rights to their children. By four issues, they challenge the factual sufficiency of the evidence to support the judgment. We hold that although the evidence is factually insufficient to support some of the grounds for termination alleged by the Department, factually sufficient evidence exists to establish that the Smiths engaged in a course of conduct that endangered their children and that termination was in the best interest of the children. We therefore overrule their issues and affirm the judgment.

**BACKGROUND**

*Bobbie Hinojosa Smith*

Bobbie Hinojosa Smith is the biological mother of the five children who are the subjects of this case, S.R.H., C.C.S., C.A.S., C.L.S., and C.R.S. Bobbie started using marihuana at the age of eleven. Since then, Bobbie testified that she has used other drugs, such as cocaine, methamphetamine, and heroin. By the time she was in sixth grade, she quit school. She left home and began living alone and supporting herself at age twelve. At age thirteen, Bobbie met and started dating Carlos Smith and Darrell Slaughter at about the same time. When Bobbie was fourteen, she gave birth to her first child, S.R.H., a daughter born in June 1992. Darrell Slaughter is S.R.H.=s biological father; whether he was aware of his paternity is disputed. Bobbie worked at a nursing home to support herself and her daughter, while her mother and sister cared for S.R.H. About a year later, at the age of fifteen, Bobbie moved in with Carlos; he was twenty-five at the time. Bobbie and Carlos conceived two children while they were living together, a daughter, C.C.S., and a son, C.A.S. The couple married on August 29, 1999, and had two more daughters afterwards, C.L.S. and C.R.S. Bobbie had a tubal ligation after the birth of her fifth child. The family eventually moved into a manufactured home on five acres of land outside of Llano. Bobbie held various jobs at different times to help support the family, sometimes working two jobs, while her husband or his sister cared for the children.

Bobbie testified that she has been arrested four or five times; two of those arrests were drug related, another was for assault. At the time of trial, she was on probation for possession of a controlled

2

substance, cocaine; her probation ends in 2004. She testified that she is not currently using drugs, has never used drugs with Carlos Smith, and has never been addicted to drugs. She further testified that she submitted to a random urinalysis test conducted by her probation officer in July 2002 (just before the trial) and tested clean. Bobbie testified that although she is not currently using drugs, she is willing to voluntarily commit herself to a drug rehabilitation facility to secure the return of her children. Bobbie also has a history of suffering from depression. On several occasions, she has had to seek medical treatment and has been prescribed anti-depressants.

*Carlos Smith*

Carlos Smith has two daughtersCages fifteen and nine at the time of trialCin addition to the four children he has with Bobbie. The oldest of the two was living with Carlos and Bobbie at the time of trial. Carlos also helped support and raise Bobbie=s oldest daughter, S.R.H. Carlos testified he was convicted for driving while intoxicated when he was eighteen years old (he was thirty-five years old at the time of trial); he successfully completed probation for that conviction. He further testified that Anine years ago@ (about 1993), he was convicted of delivering methamphetamine and marihuana. At the time, he and Bobbie had no children together. At the time of trial, Carlos was into his ninth year of a ten-year probation sentence, resulting from the delivery of a controlled substance conviction. He had another fourteen months left to complete his probation. Carlos has had no other criminal arrests.

In 1996, Carlos tested positive for marihuana; consequently, he agreed to a voluntary modification of his probation and was committed to a substance abuse felony punishment facility (SAFPF)

3

for nine months.  Upon completion of his nine months in SAFPF, Carlos spent ninety days in a halfway house before returning home.

In October 2000, Carlos again tested positive for drugs.  He had four children living with him and Bobbie at the time.  He agreed to another voluntary modification of his probation and was committed first to the Llano County jail until February 2001, when a space became available and he was able to move to an intermediate sanction facility, where he received drug counseling.  He testified he has not used any drugs since then.  In fact, he stated that he has been in recovery for several years, and his last incarceration was the result of a relapse during his recovery.  He also testified that he never used drugs around the children or with Bobbie.

In October 2001, after the Department removed his children from the home, Carlos requested and was granted an early release from the intermediate sanction facility following a court hearing.  Carlos was instructed to repair his home and instead of paying child support, he was to use his money to fund those repairs, so that the children could be returned to him.  When not incarcerated, Carlos has held various jobs to support the family.

### The children

S.R.H. is the oldest child.  Her biological father is Darrell Slaughter, but she was raised by Carlos most of her life.  She was born in June 1992 and was ten years old at the time of trial.  S.R.H. was born with a non-cancerous tumor between her eyes.  She also suffers from very poor eyesight.  She is otherwise physically healthy.  When she was about seven or eight years old, S.R.H. was sexually abused by her maternal grandmother=s boyfriend.  When Bobbie found out, she filed charges with the police and took

4

S.R.H. to a children=s advocacy center to be interviewed and to receive counseling. The Department was not involved at the time.

C.C.S. was born in March 1995 and was seven years old at the time of trial. She is a healthy child and suffers from no special problems. C.A.S., a son, was born a year later in March 1996; he was six at the time of trial. C.A.S. is also a healthy child who suffers from no special medical conditions. C.L.S., another daughter, was born in November 1999; she was two at the time of trial. She too is a healthy child. The Smiths= youngest daughter, C.R.S., was born in December 2000; she was two months old when she was removed from her home. At the time, C.R.S. required an apnea monitor to monitor her breathing. After she was removed from her home, C.R.S. was diagnosed with mild cerebral palsy and suffered from seizures.

### *The Department becomes involved*

The Department first became involved with the family in September 2000, when it received a referral regarding S.R.H. and C.C.S. A Llano police officer observed the two girls, who were eight and five respectively at the time, walking to school along a highway accompanied only by a fifteen-year-old girl and informed the Department. Bobbie had left the girls in the care of Carlos=s mother, Beulah Smith, while Bobbie visited her grandmother, who was in an intensive care unit in a San Antonio hospital. The two girls had missed the schoolbus and were walking to school with the fifteen-year-old friend of the family when they were observed by the police. As a result of the incident, the Department opened a case to initiate family-based services.

5

In January 2001, the Smiths= case was assigned to Sabrina Harris, a Department caseworker, who had been with the Department for less than a month. Harris=s duties were to make home visits, talk to the children at school, offer services to the family, such as parenting, individual counseling, anger management, drug and alcohol assessments when necessary, and Ato kind of basically watch the family and try to preserve it as much as possible to prevent removals.@

Harris made her first home visit on January 25, 2001 during the middle of the afternoon. All five children were home with Bobbie that day. Harris testified during the trial that the inside of the house was filthy; the kitchen was infested with roaches and dirty dishes, and the refrigerator was not working; there were clothes all over the living room; the front steps to the house were unstable and missing boards; the yard was strewn with trash; windows were broken; the children were dirty; the two older children were home from school because they had head lice; and the children were running in and out of the house as they pleased, except for C.R.S., who was in a baby carrier. Harris also testified that Bobbie, who had a month-old baby, appeared tired and disheveled. Carlos was incarcerated at the time. Harris instructed Bobbie to clean up the house, and said she would return in one week to check on Bobbie=s progress. When Harris returned the following week, she observed that the improvements she had requested were not made. Harris again asked Bobbie to clean the house, and told her she would be back to check on her progress.

Before her next visit, Harris received a call from the principal of the two older girls= school; he expressed concern about the girls= absences. Harris then returned to Bobbie=s house to discuss the absences. When she arrived, Bobbie was ill, so her mother answered the door. The house did not look

6

any better to Harris.  In addition, the children were running in and out of the house playing, and they were very dirty.

On February 15, Harris visited the two older girls at their school.  The girls informed Harris that they had been staying with their paternal grandmother, Beulah Smith, so that they could get to school on time.  So, Harris went to Bobbie=s house to find out why the girls were staying with their grandmother.  When she arrived, C.A.S. answered the door; he was four years old at the time.  Bobbie was in her bedroom sleeping with the two younger girls; she never came out to speak with Harris.  Later that day, Harris learned that the police had made a safety and health check[1] at the house earlier in the day.  The police did not contact the Department to report any problems.

---

[1] Harris described a safety and health check as follows:

> That=s where law enforcement is called by a party who is concerned in the community or an agency, and they go and they knock on the door and they ask to enter the home and check on the children and check on the parents and make sure that everything is okay and that there=s nobody injured and that there=s food, and to make sure that basically things are in some kind of order and that there=s supervision of the kids.

The police are required to report any suspected child abuse or neglect.

Harris returned to the home on February 22. She brought a co-worker with her, Jackie Morley Webb, to help her assess the family and the situation. Bobbie was home that day with her three youngest children; the two older girls were at school. Bobbie appeared upset because Harris had brought another person with her. At one point, Bobbie grabbed C.L.S. by her arm and dragged her down the hall. C.A.S., the boy, was running in and out of the house with a broomstick trying to Aplay fight,@ and both children were very dirty. Bobbie was yelling at her children to stop. After the visit, Harris and Webb called their supervisor Ato staff the case for removal.@ Harris=s decision to seek removal was based on her concerns about the condition of the house, the lack of supervision for the children, the condition of the children, and safety hazards in the home. Harris=s description of the safety hazards included holes in the floor, exposed wiring, holes in the bathroom, cigarette butts on the floor, clothes on the floor, trash on the floor, broken glass, the oven was open to heat the home, and the home had no heat otherwise. Harris also mentioned as safety concerns the proximity of the home to the highway and the fact that the door on the trailer did not have a lock.

Later that day, Webb picked up the two older girls from school. Harris, accompanied by law enforcement, went to Bobbie=s house to pick up the three younger children. Bobbie was distraught and upset when Harris removed the kids. Carlos was incarcerated at the time. The notice for emergency removal that Harris left with Bobbie when she removed the children states that the reason for the removal was fire and safety hazards in the home, no cooperation with the Department, and neglectful supervision of the children. The children were taken to the Department=s office. According to Harris, the children were

8

dirty, improperly clothed, hungry, and very thin. The two older girls had very bad head lice. The children were cleaned up, fed, and taken to their placements.

The following day, February 23, the Department filed its original petition for protection of the children. On March 9, the trial court held a Afourteen-day@ hearing and appointed the Department as temporary managing conservator of the children. The trial court also ordered paternity testing regarding the oldest child, S.R.H., and supervised visitation for the Smiths at the Department=s office twice a month. The court ordered the Smiths to (1) submit to and cooperate fully in psychological evaluations, (2) attend and cooperate fully in counseling sessions, (3) attend, participate in, and successfully complete parenting classes and to submit a certificate of completion within seven days of completing the classes, (4) submit to and cooperate fully in drug and alcohol dependency assessments, (5) submit urine samples at times requested by the Department for analysis by a drug testing laboratory, and (6) comply with each requirement in the Department=s service plan. The degree of the Smiths= compliance with the order is disputed. It is undisputed, however, that Bobbie failed to participate in S.R.H.=s paternity testing.

After the children=s removal, caseworker Ellie Krueger was assigned to work on the Smiths= case. She testified at trial that the Department=s main goal during the initial phase is to reunify the family and improve the situation. With that goal in mind, the first family plan was prepared in March 2001. The family plan required the Smiths to have a drug assessment and to refrain from criminal activity. They were also to attend anger management classes and parenting classes, receive psychological evaluations, receive individual counseling, and maintain stable employment and proper housing. Krueger was also concerned about Bobbie=s depression and encouraged her to get medication to combat the depression. Because the Smiths

9

did not appear to be making any progress in achieving their family service plan goals, in December 2001, the Department amended its petition and sought termination of Bobbie and Carlos=s parental rights. A jury trial was held in July 2002, during which a jury heard from twenty different witnesses. The jury found that the Smiths=parental rights to all of their children should be terminated, and the trial court signed a judgment terminating the Smiths=parental rights. This appeal follows.

## DISCUSSION

### *Preservation of factual sufficiency complaint*

As a preliminary matter, the Department urges that the Smiths have failed to preserve their objection to the factual sufficiency of the evidence because they did not file a motion for new trial. The Department argues that a motion for new trial is a prerequisite to bringing a factual sufficiency complaint on appeal, even in cases involving termination of parental rights.

A motion for new trial is a prerequisite to preserve a factual sufficiency of the evidence complaint. Tex. R. Civ. P. 324(b)(2); *Cecil v. Smith*, 804 S.W.2d 509, 510 (Tex. 1991); *see also In re M.S.*, No. 02-0509, Tex. LEXIS 108, at *37 (July 3, 2003); *In re A.F.*, No. 02-1167, Tex. LEXIS 119, at *2 (July 3, 2003) (parties preserved factual sufficiency complaint by filing motion for new trial). Whether a motion for new trial is required to preserve factual sufficiency complaints in cases involving termination of parental rights, however, is an issue that has divided the appellate courts. *See In re J.F.C.*, 96 S.W.3d 256, 276 n.71 (Tex. 2002) (expressing no opinion on the appellate courts=holdings on the issue). Recently, the supreme court held that the right to counsel for indigent persons in parental-rights termination cases includes the right to effective assistance of counsel. *In re M.S.*, Tex. LEXIS 108, at *27. In considering

10

whether counsel is ineffective for failure to preserve a factual sufficiency complaint by filing a motion for new trial, the court opined that the State=s interest Ain maintaining the familial bond versus its interest in maintaining procedural integrity weighs in favor of permitting a factual sufficiency review when counsel unjustifiably fails to@file a motion for new trial. *Id.* at *43. When evidence fails clearly and convincingly to establish that parental rights should be terminated, the court recognized that a serious risk of erroneous deprivation of parental rights exists, and the procedural rule governing factual sufficiency preservation Amust give way to constitutional due process considerations.@ *Id.* at *43-44. Although the supreme court discussed the rule governing factual sufficiency preservation in the context of the right to effective assistance of counsel, we believe those principles aptly apply in this case.

It is undisputed that appellants failed to file a motion for new trial in this case, and we are not presented with an ineffective assistance of counsel claim. Thus, unlike the supreme court in *In re M.S.*, we do not address whether appellants= counsel was unjustified in failing to file a motion for new trial. The record reveals, however, that the Smiths did file a statement of points on which they intended to appeal, in which they included their allegation that the evidence was factually insufficient to support the jury=s verdict. *See* Tex. Fam. Code Ann. ' 263.405(b) (West 2002). While the statement is not a motion for new trial, it did apprise the trial court of the Smiths= factual sufficiency complaint. Following the filing of this statement, the trial court was required to hold a hearing no later than the thirtieth day after it signed its final judgment to determine whether it should grant a new trial; this is so, even though the Smiths did not file a motion for new trial. *See id.* ' 263.405(d). Given the supreme court=s recent pronouncement regarding the importance of achieving a just and accurate decision in termination of parental rights cases and the Smiths= filing of a

11

statement of points they intended to appeal, including a factual sufficiency point, we will review the Smiths=

factual sufficiency complaint.

***Standard of review***

The natural right existing between a parent and child is of constitutional dimensions. *Holick*

*v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The United States Supreme Court has characterized the right

to raise one=s child as essentialCa basic civil right far more precious than property rights. *Stanley v.*

*Illinois*, 405 U.S. 645, 651 (1972). Because the involuntary termination of parental rights is complete,

final, and irrevocable, termination proceedings must be strictly scrutinized. *Holick*, 685 S.W.2d at 20.

A court may terminate parental rights if it finds that: (1) the parent has engaged in any of the

specific conduct enumerated in the family code as grounds for termination, and (2) termination is in the best

interest of the child. Tex. Fam. Code Ann. ' 161.001 (West 2002); *Richardson v. Green*, 677 S.W.2d

497, 499 (Tex. 1984). A termination order must be supported by clear and convincing evidence. Tex.

Fam. Code Ann. ' 161.001. AClear and convincing evidence@ means Athe measure or degree of proof that

will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought

to be established.@ Tex. Fam. Code Ann. ' 101.007 (West 2002); *accord In re C.H.*, 89 S.W.3d 17, 25

(Tex. 2002); *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). The fact finder must determine that clear and

convincing evidence supports both elements; proof of one element does not relieve the burden of proving

the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

In deciding whether the evidence is factually sufficient, this Court reviews the record to

determine if the evidence is such that Aa fact finder could reasonably form a firm belief or conviction about

the truth of the State=s allegations.@ *In re C.H.*, 89 S.W.3d at 25. A firm belief or conviction is a standard short of that of beyond a reasonable doubt. *Id.* at 26. This standard retains the deference that an appellate court must have for the jury=s fact finding mission. *Id.* We are mindful that the jury has the opportunity to view the demeanor of the witnesses throughout trial, and its role is to weigh their testimony. *In re W.E.C.*, 110 S.W.3d 231, 247 (Tex. App.CFort Worth 2003, no pet.). The Department alleged seven statutory grounds for termination of the Smiths= parental rights. *See* Tex. Fam. Code Ann. ' 161.001(1)(D), (E), (F), (J), (N), (O), (P). Hence we will affirm the termination of the Smiths= parental rights if there is sufficient evidence of any one of the enumerated acts alleged by the Department and that termination is in the children=s best interest.

### Dangerous environment

Sections 161.001(1)(D) of the family code provides that the trial court may terminate the parent-child relationship if the court finds by clear and convincing evidence that the parents have Aknowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.@ Tex. Fam. Code Ann. ' 161.001(1)(D). In an involuntary termination proceeding, Aendanger@ means conduct that is more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Texas Dep=t of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary, however, that the child suffer physical injury for a finding of endangerment to be made. *Id.* Rather, endangerment means to expose to loss or injury or to jeopardize. *Id.*; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *Leal v. Texas Dep=t of Protective & Regulatory Servs.*, 25 S.W.3d 315, 325 (Tex. App.CAustin 2000, no pet.), *disapproved*

*on other grounds*, *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). Endangerment can occur through both the acts and omissions of the parent. *Phillips v. Texas Dep=t of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.CAustin 2000, no pet.). Under this subsection, the child=s environment must be the source of the endangerment to the child. *In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.CHouston [14th Dist.] 1998, no pet.), *disapproved on other grounds*, *In re C.H.*, 89 S.W.3d 17 (Tex. 2002).

Harris testified that during her first visit to the Smith home, she observed that the inside of the house was filthy; the kitchen was infested with roaches and dirty dishes, and the refrigerator was not working; there were clothes all over the living room; the front steps to the house were unstable and missing boards; the yard was strewn with trash; and windows were broken. During her two subsequent visits, Harris did not observe any signs of improvement of the conditions. On February 22, the day that the children were removed from the home, Harris=s description of the safety hazards in the home included holes in the floor, exposed wiring, holes in the bathroom, cigarette butts on the floor, clothes on the floor, trash on the floor, broken glass, the oven was open to heat the home, and the home had no heat otherwise. She also mentioned as safety concerns the proximity of the home to the highway and the fact that the door on the trailer did not have a lock.

The children=s guardian ad litem, Kay McCorquodale, also testified that when she visited the Smith home in August 2001, the home Awas a wreck@ and A[n]ot suitable for children to live in.@ She observed a broken window, garbage, clothes, and torn up furniture strewn around the house, and the bathroom was Atorn up.@ Outside, she saw an old refrigerator, an old water heater, an old washing machine, and various junk. She testified that on her next visit, she observed that many of the repairs had

14

been made and the inside of the house was all right; however, the porch needed to be finished and the junk in the yard needed to be cleaned out. She had not visited the Smiths= current dwelling.

Ellie Krueger testified that after she took over the case, she visited the Smith home during the summer of 2001. Carlos was incarcerated at the time. She saw that improvements had been made, but more were still needed. On her second visit, she saw more improvements had been made. Specifically, a carpenter had built a porch onto the front of the home, and Amade it really look safe [b]ecause if a child would come out the front door of the manufactured home, they could, you know, stay right there instead of going out into the yard.@ She still expressed concern with the absence of screens on the windows and the Abasic yard, the children didn=t need to be running around in because of hazards out there.@ Also, there was one spot on the kitchen floor that sank when someone stepped on it. Although it appeared that someone had tried to repair it, it still sank. Krueger testified that she never saw any roaches in the home. She was still concerned about some wires hanging from the wall and the risk they might pose for young children. When Krueger was asked what still needed to be done to make the repairs to the Smith home complete, she replied that the house needed a health and fire inspection. Krueger=s last inspection of the Smith home took place four months before a December 2001 permanency hearing, and she did not know what repairs had been made since that time. When asked if the Smiths had completed the goal of repairing their home, Krueger responded A[a]s much as they could within means.@ Krueger had not inspected the Smiths=current home, which is a state-subsidized apartment.

The Smiths do not dispute on appeal that their home was filthy and unkept at the time of the children=s removal. Bobbie Smith testified that she tried to combat the pest problem by using a Abomb,@

15

bug spray, and roach motels. She also testified that she was generally tired from having just had a baby and a tubal ligation. Bobbie testified that sometime in February, she moved in with her mother-in-law Beulah Smith because she was told her home was not fit. When she discovered that her youngest daughter required the use of an apnea monitor, which had to be hooked up to a phone line, she returned to her trailer with the children because Beulah=s home did not have a phone line. Bobbie had maintained a phone line at her trailer because her father-in-law was staying on the premises to repair the trailer. Bobbie testified that she intended to stay at the trailer only for a few days until a phone line could be hooked up at Beulah=s. She also testified that before returning to the trailer, Bobbie called Harris to inform her that she would be returning to the trailer temporarily. (Although Harris confirmed that Bobbie indeed called her to tell her about the apnea monitor, she disputes that Bobbie told her she was living with Beulah and would be returning to the trailer for a few days.) It was during this temporary stay that the Department removed the children.

After the children were removed, Bobbie embarked on a remodeling effort. She testified that all the floors were remodeled; new carpet was installed in every bedroom; tile was installed in the hallway, bathroom, and kitchen; windows were replaced; and everything was generally cleaned up. With the help of her father-in-law, she made most of the repairs, and Carlos finished them when he was released from the intermediate sanction facility. Bobbie provided pictures of the newly remodeled home for the jury. She also testified that a fire and health inspection was done, but had no documentary evidence to prove it. When the Smiths learned that the repairs to the house were insufficient, they moved into a Section 8 apartment; that is, one subsidized by the State.

16

Carlos testified that just before he was sent to Llano County jail and then to the intermediate sanction facility, he, Bobbie, and the children had been living in a house. After the roof fell in at that house, the family moved to the trailer. Shortly after the move, Carlos was incarcerated. He testified that he was not very familiar with the conditions of the trailer because he was incarcerated just after they moved into it. When he was released, however, he finished repairing it.

While the testimony at trial establishes that the family was living in a less than ideal environment, it does not rise to the level of clear and convincing evidence sufficient to establish endangerment to the well-being of the five children. There is no evidence that the children were malnourished or that conditions in the trailer were so unsanitary or inadequate so as to threaten the children=s health. *Cf. In re M.C.*, 917 S.W.2d at 270. Moreover, the Smiths resolved their living conditions by moving into a state-subsidized apartment. Accordingly, we hold the evidence is factually insufficient to establish a violation of section 161.001(1)(D) of the family code.

*Dangerous conduct*

Section 161.001(1)(E) provides that a parent=s rights may be terminated if it is established by clear and convincing evidence that the parent has Aengaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.@ Tex. Fam. Code Ann. ' 161.001(1)(E). Under subsection (E), we look to the parents= conduct alone, including actions, omissions, or the parents= failure to act. *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.CFort Worth 2001, no pet.). The endangering acts need not have been directed at the child, or have caused an actual injury or threat of injury to the child; the parent need only have engaged in a course of conduct that endangered the child=s physical or emotional well-being. *Id.* Termination under this subsection must be based on more than a single act or omission; a voluntary, deliberate, and conscious Acourse of conduct@ by the parent is required. *Id.* at 812. In its brief, the Department argues that Bobbie and Carlos engaged in conduct endangering their children=s well-being by (1) failing to tend to the children=s medical needs, (2) failing to adequately supervise the children, (3) neglecting the children=s educational needs, and (4) engaging in drug use, which in the case of Carlos, has resulted in incarceration.

The youngest child, C.R.S., has special medical needs. She required the use of an apnea monitor, was diagnosed with mild cerebral palsy, and suffered from seizures when she was first placed in her foster home. In its brief, the Department contends that the Smiths Aoffered no evidence that they gave [C.R.S.] the needed physical therapy to help reduce the effects of her cerebral palsy.@ It is clear from the record, however, that Bobbie sought medical treatment for C.R.S., as recently as the morning that C.R.S. was removed from her home. A few days before the Department removed the children, Bobbie took C.R.S. to the hospital emergency room because she had stopped breathing. A doctor there told Bobbie

18

that C.R.S. needed an apnea monitor and that Bobbie should contact a specialist. Bobbie contacted a specialist the following day; the specialist told Bobbie that she would need a phone line in order to use the apnea monitor. So, Bobbie, who had been staying with her mother-in-law at the time, moved back to her trailer because her mother-in-law had no phone line, but the trailer did. On the morning of February 22, the same day the Department removed the children, a specialist, Dr. Forrester, came to Bobbie=s home, showed her how to work the apnea monitor, taught her CPR and what to do if the child began choking. A few hours later, the Department came to visit Bobbie and shortly thereafter, returned to remove her children. There is nothing in the record to suggest that C.R.S. had been diagnosed with or that Bobbie had been aware of the cerebral palsy at that time. In fact, C.R.S.=s foster mother, Reba Leming, testified that C.R.S. was not diagnosed with cerebral palsy until after she came into Leming=s care and Leming took her to a pediatrician, who diagnosed her. Leming, who is a rehabilitative foster parent, testified that when C.R.S. arrived, she was not yet at the crawling stage, and evidently there would have been no way to know up until that point to even check for cerebral palsy.

The Department also contends that Bobbie neglected S.R.H.=s, C.L.S.=s, and C.C.S.=s medical needs. When S.R.H. arrived in her foster home, she had six bad teeth, according to Ruth Fowler, her foster parent. S.R.H. cried when she tried to eat, and her teeth bled. Fowler took S.R.H. to a dentist, who capped three of the teeth and removed three, two of which were abscessed. All six teeth were baby teeth. Both S.R.H. and C.C.S. had recurring problems with head lice. Also, Margaret Markham, C.L.S.=s foster parent, testified that when C.L.S. first arrived at her foster home, she had ear infections and an ankle problem. A physician treated her ear infections, and an orthopaedist has looked at her ankle. Finally, the

19

Department asserts that the children were all hungry, dirty, and very thin when they were removed from their home; C.L.S., for example, had milk underneath her chin. The record includes no evidence, however, that the children were malnourished, and in fact, Harris testified that she observed plenty of canned juices and food in the kitchen cabinets during her visits. Also, Harris acknowledged that the children had been playing outside before she came to remove them, and that they could have gotten dirty while playing.

Bobbie testified that she Adoctored@ the lice problem, but it continued to persist. She believed the girls were exposed to lice at their school, as none of her other children had the same lice problem. She was not questioned about S.R.H.=s teeth or about C.L.S.=s ear infections and ankle problem.

The Department contends that the Smiths failed to supervise their children. It points to the incident in which the two older girls were observed walking to school along a busy highway. Bobbie explained that she was in San Antonio for three days visiting her grandmother, who was in a hospital intensive care unit, when her children were observed walking along the highway. The girls were eight and five years old at the time. Carlos went to San Antonio to pick up Bobbie, and left the children with his mother Beulah Smith. Beulah Smith testified that she was caring for the children, but when she had to leave for work, she entrusted them to her son-in-law, who in turn entrusted them to a family friend. When the two girls missed the school bus, the fifteen-year-old daughter of the family friend walked them to school along the busy highway.

In addition, during her initial visit, Harris observed the children running in and out of the house as they pleased, unsupervised. When Harris returned for another visit, C.A.S., who was four at the time, answered the door because Bobbie was asleep in her bedroom with the two younger girls. C.A.S.

20

was watching television, playing and running outside, unsupervised. Bobbie did not recall a visit from Harris while she was sleeping. Harris also testified that on that day, the police had visited Bobbie earlier and had made no report to the Department regarding the condition of the house or the children. In addition, Harris admitted that Bobbie=s father-in-law had been staying on the Smiths=property in a camper; his wife, Beulah Smith, explained that he was there to make repairs to the Smiths=home. Harris, however, did not see Mr. Smith on the day of her visit.

Webb testified about the day she joined Harris for a visit to Bobbie=s house on another occasion. On that day, Bobbie was home with the three younger children. Webb testified that at one point, they (presumably, Webb, Harris, and Bobbie) were standing outside on the front porch while C.A.S. was swinging a broomstick or a piece of wood near them. Because no one told the boy to put the stick down, Webb did so. She also observed that when C.R.S., the baby, was crying, Bobbie did not tend to the baby, and after several minutes, Webb picked her up and comforted her. In addition, as the three women were walking through the house, C.L.S. began crying. Bobbie responded by grabbing the girl=s arm and yanking her, just missing a piece of wood in the hallway that could have hit C.L.S.=s head.

McCorquodale testified that during her observation of the Smiths and their children, she did not see anything that concerned her about the Smiths= parenting abilities, and they were able to appropriately discipline the children.

Regarding their educational needs, Ron Province, the principal of Llano Elementary School testified about the older girls= attendance history and academic achievements.[2] According to Province,

---

[2] The Department listed the Smiths=failure to keep their children enrolled in school as an additional

21

S.R.H. enrolled in kindergarten in August 1997, withdrew in November, re-enrolled in December, and withdrew again in February 1998.[3] S.R.H. returned to kindergarten the following school year, enrolling in the fall of 1998. Of 180 total days in the school year, S.R.H. missed 43 days. Consequently, she was assigned to mandatory summer school to make up some of the absences. She was pretty much on level in kindergarten, and after she completed summer school, she was promoted to first grade. During her first grade year, S.R.H. was absent 48 days of the 180-day school year. At the end of her first grade year, S.R.H. was not recommended for promotion to the second grade, due in part to the excessive number of absences and the amount of instruction that she had missed. She was nevertheless promoted to the second grade and enrolled in the fall of 2000; she was officially withdrawn on March 4, 2001. (S.R.H. was removed from her home on February 22, 2001.) Of the 90-day period during which she was enrolled, S.R.H. was absent 33 days. Although she had begun the school year performing well, by the time she was withdrawn, S.R.H. was failing in all of her subjects. C.C.S. enrolled in kindergarten in the fall of 2000 and was withdrawn March 5, 2001. She had 41 absences during that time period. She was performing satisfactorily in all her academic areas. Province testified that neither child exhibited discipline problems and both were Agreat@ and loveable kids.

---

basis for terminating their rights. *See* Tex. Fam. Code Ann. ' 161.001(1)(J)(i). The evidence adduced at trial, however, does not demonstrate that the children were not enrolled in school. Rather, they were enrolled, but did not attend regularly.

[3] Under the education code, a child does not have to be enrolled in school if he or she is under the age of six. Tex. Educ. Code Ann. ' 25.085 (West Supp. 2003).

Province testified that he did not know the reason for the girls= excessive absences. He acknowledged, however, that at least some of them were due to the girls= problems with lice. According to Province, once lice is discovered on a child, the child=s parents are contacted and the child is sent home. Before the child can return to the school, he or she must be examined by the nurse, who checks for live and moving lice.

Province also testified about his interaction with Bobbie. He characterized her as cooperative and always willing to talk with him. He Anever felt like she was not trying;@ he just felt that Ashe couldn=t do whatever it was we were asking her to do.@

Bobbie testified that some of S.R.H.=s absences were due to appointments with the eye doctor. In addition, Bobbie kept S.R.H. home for about a week because her glasses were broken, she could not see, and her eyes hurt. Bobbie also stated that S.R.H. was often sent home because of lice or nits in her hair. So, Bobbie took S.R.H. out of Llano County elementary school and enrolled her in Burnet County elementary school; she did not specify when she did this, however. She also stated that on occasion, she had to go out of town, and took the children with her. And sometimes the absences were because she was trying to care for five children, two of whom were babies, while her husband was incarcerated.

The Department contends that the Smiths= drug use and incarcerations endangered the children. Michael Okolo, Bobbie=s probation officer, testified that Bobbie was placed on probation in May 2001 for possession of cocaine; she will complete probation in May 2004. One of her conditions of probation is drug treatment, although Okolo was still trying to find a drug treatment program for her. In

23

addition, Bobbie is required to submit to random urinalysis tests. The first one that Okolo scheduled was on October 17, 2001. When Bobbie arrived for the test, Okolo instructed her to wait for him in the lobby. When he returned to the lobby to retrieve her, Bobbie was gone and did not submit to the test that day. Okolo tested Bobbie in June 2002, and she tested positive for cocaine. The next time he tried to conduct a urinalysis test was on July 9, 2002; he tested Bobbie for cocaine, marihuana, methamphetamine, PCP, and amphetamine. Bobbie tested clean.

Sometime after October 2001, Okolo filed a motion to revoke Bobbie=s probation based on the offenses of hindering apprehension and making a false report to a peace officer. The outcome of that motion to revoke and the underlying offenses is unclear from the record. Okolo testified that Bobbie=s probation was continued, and she was not revoked. She was ordered, however, to spend 75 days in the county jail, but she was given credit for time served; she was also ordered to complete outpatient treatment. Okolo was not aware of what, if anything, happened with the hindering apprehension and making a false report to a peace officer allegations. Bobbie testified that she was found not guilty on those charges.

Darrell Slaughter testified about the day that Bobbie showed up on his doorstep with S.R.H. in 1997. She showed up one evening in either late summer or early fall and told Darrell that S.R.H. was his daughter, that she could not take care of her right then, and that Darrell needed to do so. Darrell testified that Bobbie was Awithout a doubt messed up on drugs, wired to the gills.@ Bobbie wrote a note giving Darrell and his wife temporary custody of S.R.H. At the time, S.R.H. was, according to Darrell, Aplumb full of head lice and just as filthy as could be.@ Darrell and his wife took care of S.R.H. and enrolled her in school; she lived with them for about four months. Then, one night, Bobbie showed up at Darrell=s

24

doorstep at about 3:00 a.m., asking to see S.R.H. According to Darrell, Bobbie had fresh track marks on her neck and was A[w]ound up like a nine-day clock.@ Bobbie wanted to take S.R.H., but Darrell would not let her. The next day, S.R.H. did not return home from school. Bobbie testified that she left S.R.H. with Darrell Slaughter because Carlos was incarcerated and she Acouldn=t handle things right then.@

Bobbie also testified that she has done drugs since the age of eleven. She stated that she no longer uses drugs and does not plan to start using them again. According to Bobbie, she was never an addict, never used drugs around her children or in the home, and the use of drugs never affected her parenting abilities, but she did once leave her family and used drugs, entrusting the children to Carlos. She said that if her children were returned to her, she would commit herself to a drug treatment facility.

Gaylene Simpson, Carlos=s probation officer, also testified. According to Simpson, Carlos was placed on probation for possession of a controlled substance and delivery of marihuana. Simpson testified that in early 1996, Carlos tested positive on a urinalysis, causing his probation officer to require weekly reporting. He again tested positive in the summer of 1996. He had a few more positive urinalysis test results in the fall and winter of 1996, causing Simpson to file a motion to revoke. That is when Carlos agreed to a modification of his probation, and he was ordered to SAFPF in February 1997. After he was released from SAFPF, Carlos had two more positive urinalysis tests, and a couple of negative ones. As a result, Simpson filed another motion to revoke, and Carlos agreed to a modification of his probation, by which he was ordered to the intermediate sanction facility. Carlos was transferred to the intermediate sanction facility in February 2001, and was to stay there for a year. But in October 2001, after his children

25

were removed, Carlos petitioned for an early release, and the court granted it. Since his release, he has had no more dirty urinalysis tests.

In sum, evidence of Bobbie=s failure to supervise her children or tend to their medical needs does not alone rise to the level of clear and convincing evidence sufficient to establish a voluntary course of conduct that endangers the physical and emotional health of the children. Bobbie sought counseling for S.R.H. when she was sexually assaulted, and she sought the necessary treatment for C.R.S. when she discovered that the baby needed to have her breathing monitored. Although the two older girls were often plagued with lice, Bobbie attempted to treat the problem. Indeed, if she had not, the girls would never have been allowed to return to school. And although Bobbie=s exercise of poor judgment may have resulted in her two girls walking along a busy highway with a teenager, there is no evidence that Bobbie or her mother-in-law, Beulah, was aware of or approved of the occurrence and no evidence that the incident occurred again.

When this evidence is coupled, however, with the evidence demonstrating Bobbie=s failure to ensure that her two older girls were attending school and both Bobbie=s and Carlos=s use of drugs and their resulting incarcerations, we cannot say that a reasonable fact finder could not have formed a firm belief or conviction that the children were endangered by the Smiths=conduct.[4] Although both Bobbie and Carlos

---

[4] Under section 161.001(1)(P), a parent=s rights may be terminated if clear and convincing evidence establishes that the parent Aused a controlled substance . . . in a manner that endangered the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance.@ Tex. Fam. Code Ann. ' 161.001(1)(P). The record reveals that Bobbie did not complete a substance abuse treatment program. It is unclear whether Carlos=s commitment to the intermediate sanction facility constitutes a drug abuse treatment program. He has not tested positive for drugs since his release.

asserted that they never used drugs around the children, there is some evidence that Bobbie was under the influence of drugs when she left S.R.H. with Slaughter. Moreover, one parent=s drug-related endangerment may be imputed to the other parent. *Edwards v. Texas Dep=t of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.CEl Paso 1997, no pet.).

Further, Carlos=s use of drugs resulted in his absence from the family, leaving the children in Bobbie=s care. Imprisonment, standing alone, does not constitute Aengaging in conduct which endangers the emotional or physical well-being of the child.@ It is a fact properly considered, however, on the issue of endangerment. *Boyd*, 727 S.W.2d at 533-34; *In re D.T.*, 34 S.W.3d 625, 635-36 (Tex. App.CFort Worth 2000, pet. denied); *In re B.S.T.*, 977 S.W.2d at 485. The Department need not show incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. Thus, if the Department proves that incarceration was part of a course of conduct that has the effect of endangering the child, the requirement of subsection E is met. *Boyd*, 727 S.W.2d at 533-34. In this case, the evidence proves that Carlos=s incarceration due to his drug use and Bobbie=s drug use are part of a course of conduct endangering their children. *See In re D.M.*, 58 S.W.3d at 813.

### *Failure to comply with court order*

Although we have determined that factually sufficient evidence demonstrates that both Carlos and Bobbie engaged in a course of conduct endangering their children, we have also reviewed the

---

We nevertheless hold that his use of drugs constitutes conduct that endangers his children.

27

evidence regarding the parents= compliance with the trial court=s order. Section 161.001(1)(O) provides

that the court may order termination if it finds by clear and convincing evidence that the parents

> failed to comply with the provisions of a court order that specifically established the actions
> necessary for the parent to obtain the return of the child who has been in the permanent or
> temporary managing conservatorship of the Department of Protective and Regulatory
> Services for not less that nine months as a result of the child=s removal from the parent
> under Chapter 262 [Procedures in Suit by Governmental Entity] for the abuse or neglect of
> the child.

Tex. Fam. Code Ann. ' 161.001(1)(O). On March 9, 2001, following an adversary hearing the trial court

signed temporary orders, which required the Smiths to comply with a number of provisions in order to

obtain the return of their children. Among those provisions were the following: the parents were (1) to

submit to a psychological evaluation, (2) to attend counseling sessions, (3) to attend and successfully

complete parenting classes, (4) to submit to a drug and alcohol dependency assessment, including urinalysis

testing, and (5) to submit to and successfully complete a substance abuse treatment program. The court

also ordered paternity testing for S.R.H. On January 28, 2002, the trial court signed a permanency hearing

order, by which the court continued all previous orders issued by the court but made the following

modifications: further paternity testing for S.R.H. was not necessary and so that requirement was waived,

and Carlos was ordered to begin paying child support in the amount of $100 per month.

It is undisputed that Bobbie failed to participate in a paternity test. She testified that she

attempted to submit to the test on two separate occasions, but was unsuccessful. On her first attempt, she

was told she could not have the test done without an appointment. So, the Department scheduled an

appointment for her. When she returned at the appointed time, she was told she needed proper

28

identification, which she did not have. Once it was confirmed that Darrell Slaughter was S.R.H.=s biological father, the court modified its order eliminating the requirement that Bobbie submit to the paternity test. Curiously, the record reveals that the trial court later reinstated the order compelling Bobbie to submit to a paternity test. On July 8, 2002, the trial court granted the Department=s motion for contempt and found Bobbie in contempt for failing to submit to genetic testing.

It is also undisputed that Carlos failed to pay the court-ordered child support. Carlos testified that he intended to pay the child support, but he was trying to catch up on debts accumulated while he was in the intermediate sanction facility. On appeal, he argues that he was unaware that his rights might be terminated for failure to pay child support.

In addition to these provisions, the record contains evidence demonstrating that although the Smiths complied with some of provisions in the court order, they failed to comply with all of the provisions. Krueger testified that both Bobbie and Carlos had submitted to psychological evaluations. She also testified that the Smiths were frustrated and angry Aabout how do I do it [comply with the family service plan]@; they did not know how to move on and work with the Department. They tried to talk to Krueger during their visits with the children, but she informed them that the time was inappropriate and encouraged them to set appointments.

Bobbie testified that when she was ordered to participate in counseling, she found a counselor and paid for the sessions herself. Bobbie=s counselor, Bobbie Strickland, testified that she saw Bobbie about five or six times for fifty-minute individual counseling sessions, beginning in February 2000; they mostly discussed parenting skills. Strickland stated that they were unable to meet as regularly as she

would have liked because Bobbie often set up counseling sessions and either would call to cancel her appointment or would simply not show up. Strickland testified that she recalled Bobbie suggesting that money, work, and transportation issues prevented her from making all of her appointments. She also testified that she knew Bobbie had a new job and that she could not miss work in order to attend counseling. She characterized Bobbie as fair when asked how successful Bobbie had been in gaining the necessary skills. Because they were unable to meet consistently, however, Strickland did not believe that Bobbie had sufficiently improved on her parenting skills to send her children home.

As for parenting skills classes, Bobbie testified that she enrolled in two separate parenting classes. She claimed to have attended parenting classes at Buckner Ranch for about six weeks, and then went to parenting classes at Burnet Child Protective Services offices between two and four times. She also enrolled in anger management classes but was kicked out when she expressed an opinion that angered the instructor. Krueger, however, testified that although Bobbie did try to attend parenting classes at Buckner Ranch, she did not complete the session. According to Krueger, Buckner Ranch had a policy that if a parent missed one class, she could not finish the session. Bobbie missed a class and was not allowed to finish the session. Krueger testified that Bobbie had asked her to set up the parenting classes again, but it seems Bobbie did not complete them.

Bobbie testified that initially she was told the Department did not have the funds to pay for her drug assessment or urinalysis tests, and she would have to pay for them herself. Krueger later testified that Bobbie eventually submitted to a drug assessment as ordered, but did not complete a drug treatment program.

30

Carlos Smith does not dispute that he has not participated in individual counseling. He went to one counseling session, but was incarcerated and could not attend the counseling sessions Krueger had set up for him. He, however, testified that he completed everything else that was included in the Department=s family service plan. He took parenting classes while he was in SAFPF and anger management classes while in the intermediate sanction facility, as well as some other classes such as life skills and job readiness. Although he took the parenting class while he was in SAFPF, which was before he was ordered to, Carlos testified that he did not think it made any difference.

Krueger, on the other hand, testified that the parenting class that Carlos claims to have completed was taken too long ago, back in 1997 or 1998. And, Krueger was not certain that the class included all of the things that a parenting class taught by Child Protective Services would have included. She also requested that Carlos repeat some of the classes he had taken while in the intermediate sanction facility, explaining that Ait would not harm him in any way to repeat them if that is what had to be done.@ She complained that although she initiated two counseling sessions for Carlos, he attended only one. In addition, he failed to inform her when Bobbie was incarcerated. And he never completed a drug assessment, although Krueger was not aware if he had completed one as part of his probation. Nevertheless, when asked during the December permanency hearing by the attorney representing the Department, AWhat do you think specifically Mr. Smith has done that would justify termination,@ Krueger answered, AI cannot say that he has done anything to terminate.@ Later during that hearing, when asked to provide a letter grade to rate Carlos=s compliance with the family service plan, Krueger answered, AB plus.@

31

In sum, the evidence establishes that Bobbie failed to comply with virtually all of the provisions in the trial court=s order. As for Carlos, the evidence is not as compelling. Carlos completed several classes, including anger management classes. He attempted to obtain his GED, but was unsuccessful. While he attended only one counseling session, Krueger had set up only two appointments. He obtained suitable housing and submitted to urinalysis tests through his probation officer. He has consistently remained employed, although he changes jobs frequently. While he has not satisfied his child support obligations, he testified that he is attempting to catch up on his financial obligations. The record reveals that Carlos has at least made progress in satisfying all of the provisions included in the trial court=s order. Indeed, Krueger herself admitted in December 2001 that he was doing well.

Because we have already concluded that clear and convincing evidence supports the allegation that Bobbie and Carlos engaged in a course of conduct that endangered their children, we need not determine whether the evidence relating to compliance with the trial court=s order is also clear and convincing. We nevertheless find the evidence relevant as it relates to the best interests of the children, which we discuss below. We overrule the Smiths= first two issues.

### *Best interest of the children*

By their third and fourth issues, the Smiths argue that the evidence is factually insufficient to establish that termination is in the best interest of the children. *See* Tex. Fam. Code Ann. ' 161.001(2). Factors to be considered by a court in determining the best interest of a child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the parental ability of the individuals seeking custody; (4) the programs available to assist these individuals to promote the best

32

interest of the child; (5) the plans for the child by these individuals or by the agency seeking custody; (6) the stability of the home or proposed placement; (7) the acts or omissions of the parents that may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The court is not required to consider all of the listed factors or any unique set of factors; it may also consider additional factors. *Id.* at 372.

The children did not testify at the trial, and thus, did not disclose their desires. As for their physical and emotional needs, each of the children=s counselors and foster parents testified at trial. Carolyn Garner, S.R.H. and C.C.S.=s counselor, had been counseling the two girls from September 2001 through May 2002. Throughout their course of therapy, the girls never indicated that they had been abused or neglected by their parents. S.R.H. was also attending group therapy to address her prior sexual abuse. According to Fowler, her foster parent, S.R.H.=s needs include continued therapy to address her sexual abuse, dental care, and vision care. Both girls need maintenance to prevent the lice problem, and continued assistance with their schoolwork.

Gene Hartin, C.A.S.=s counselor, testified that he has seen C.A.S. more than fifty times for counseling; he began seeing C.A.S. when he was about five years old. His initial observations of C.A.S. were that he lacked basic communication skills and experienced developmental delays. After about eighteen months, Hartin has noticed considerable progress. C.A.S. speaks clearly now and has improved his ability to express himself. Hartin opined that C.A.S.=s early life was Asomewhat like living in a large closet with very little stimulation and interaction with others,@ making it difficult for him to learn how to express himself. Hartin further opined that all the therapy in the world would not help C.A.S. without

33

exposure to Aas much activity, to as much human interaction, to as much family interaction, to as much eating around the supper table, people reading to him when he goes to bed. Constant conversation with him.@ C.A.S. also takes Adderall to help him pay attention in school.

C.R.S. has special needs related to her cerebral palsy and respiratory problems. Specifically, C.R.S. needs continued therapy, speech therapy, and medication for her seizures. Her therapy is currently being provided everyday by her rehabilitative foster parent, Leming. An early intervention program provided someone to show Leming how to administer that therapy, but Leming testified that C.R.S.=s parents could also administer therapy if shown the proper techniques. C.R.S. also sees a neurologist for her seizures, an ear, nose, and throat specialist, and a pediatrician. Her condition has improved, and she is now walking.

It is undisputed that the children=s counselors would still be available to assist the children if they were returned to their home. As for future plans for the children, Krueger testified that if the Smiths= parental rights were terminated, the Department would seek adoption with the goal of keeping the children together. If the Smiths= rights were not terminated, the Department would seek permanent managing conservatorship.

In addition, Margie Markham, C.L.S.=s foster parent, stated that she and her husband were interested in adopting C.L.S. She also stated that Aif [the Department] would like to move the other children into our home, that that would be acceptable also.@ She stated that the other children Aare welcome to come and see if a relationship would develop.@

34

Darrell Slaughter also expressed an interest in taking custody of S.R.H. and adopting C.C.S. if the chance arose. Slaughter has a criminal record that includes assault and public intoxication. He testified, however, that he has turned his life around and would do whatever is required for the children≈s best interest. He has two other children, a steady job, and a stable home.

Although C.A.S.≈s foster parent and C.R.S.≈s foster parent were not interested in adopting the Smith children, both indicated that they were willing to take care of the children on a long term basis.

McCorquodale testified that she believed the children would be better off if they were adopted. She thought that Carlos was sincere in his efforts to try to have the children returned to him, but Bobbie did not want them badly enough to do what she needed to do.

Beulah Smith, Carlos≈s mother, testified that she would be willing to help Carlos care for the children if they were returned to him and if Bobbie committed herself to a drug treatment facility.

In sum, the children are currently in stable environments, and all of their needs are being satisfied. We hold the evidence is factually sufficient to support a finding that termination of the Smiths= parental rights was in their children≈s best interest.

## CONCLUSION

Having concluded that the evidence is factually sufficient to support the jury≈s findings, we overrule the Smiths= issues on appeal and affirm the trial court≈s judgment terminating their parental rights.

35

Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed:   September 11, 2003